**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| BHUPENDRA PARIKH, | ) | CASE NO. 1:04 CV 2363 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| CLEVELAND HARDWARE AND | ) | |
| FORGING COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | **MEMORANDUM OF OPINION** |

On December 22, 2005, Defendants Cleveland Hardware & Forging Company ("Cleveland Hardware"), Jeffrey A. Schwed ("Schwed"), and Thomas Birkel ("Birkel") (collectively "Defendants") filed a Motion for Summary Judgment as to all of the claims in Plaintiff Bhupendra Parikh's amended complaint.  (Doc. No. 37).

For the reasons discussed in detail below, Defendants' motion for summary judgment is (Doc. No. 37) is GRANTED.

**I. Procedural Background**

On March 23, 2005, Plaintiff filed the instant action against Defendants, alleging Defendants demoted and later discharged him because of: (1) his ancestry and ethnic characteristics in violation of 42 U.S.C. § 1981; and (2) his age in violation of Ohio Revised Code ("O.R.C.") § 4112.02(A).  The action was originally assigned to District Court Judge Lesley Wells.  On May 25, 2005, the parties consented to transfer this action to the docket of the Magistrate Judge.  (Doc. No. 21.)  Defendants now seek summary judgment on all claims.

## II.  Statement of Facts

### A.      Plaintiff's Hiring and Promotion

On September 9, 1996, Cleveland Hardware employed Plaintiff Bhupendra Parikh ("Plaintiff"), of East Indian descent, as an engineer at an annual salary of $38,250; Plaintiff was fifty-two years old at the time.  (Amended Complaint at ¶¶ 7, 8; Parikh Dep. at 18.)

On January 15, 1997, another company offered Plaintiff a position at an annual salary of $50,000.  (Parikh Dep. at 41.)  In response, Cleveland Hardware promoted Plaintiff to Research and Development Manager at an annual salary of $52,000.  (Parikh Dep. at 42-43.)

In July 1997, Cleveland Hardware promoted Plaintiff to Engineering Manager after the prior manager switched departments.  (Parikh Dep. at 57.)  As the Engineering Manager, Plaintiff was responsible for supervising two engineers and two research and development technicians.  (Parikh Dep. at 60.)

### B.      Events Leading to Plaintiff's Demotion

Defendants allege that Cleveland Hardware's engineering department struggled under Plaintiff's leadership and cite specific examples.

Defendants assert that the installation of Pro/Engineer ("Pro/E"), a three dimensional drafting software program, was plagued by problems.   First, Defendants claim the 1998 Pro/E installation was delayed because Plaintiff failed to order and receive the necessary hardware for installation in a timely manner.  (*See* Socha Declaration; Parikh Dep. Exhs. T and U).   Plaintiff asserts that Cleveland Hardware assigned employee Paul Bender the task of ordering and implementing the correct hardware.  (Parikh Declaration.)  Second, Plaintiff cancelled Pro/E training on two separate occasions, causing tension between Cleveland Hardware and the Pro/E

2

vendor.  (*See* Socha Declaration; Parikh Dep. Exh. U.)

Defendants maintain that the engineering department suffered retention problems under Plaintiff's leadership.  Between December 1998 and December 1999, five engineers, all under Plaintiff's supervision, were hired by Cleveland Hardware and all resigned within that period.  (Birkel Declaration.)  Two engineers resigned after one month of working under Plaintiff, one resigned after two months, and one resigned after three months.  (*Id*.)  Thereafter, in May 2000, a sixth engineer resigned, specifically citing his inability to work with Plaintiff.  (*Id*.)  Plaintiff maintains the engineers who resigned between December 1998 and December 1999, left for reasons other than personality conflicts with Plaintiff.  (Parikh Declaration.)

In January 2001, Tom Birkel replaced Jim Hoban as Cleveland Hardware's General Manager.  (Parikh Dep. at 63; Birkel Declaration.)  After approximately four months in this position, Birkel evaluated Plaintiff and noted:

> My perception . . . is you also need to work on people skills [and] interpersonal skills.  The recent turnover in engineering reflects negatively on your strength in managing people.  I would like to see a more cooperative approach both within the engineering department and in dealing with other departments.

(Parikh Dep. Exh. J.)

Birkel received complaints from employees that Plaintiff did not accept criticism of his work and refused to listen to other's ideas.  (Birkel Dep. at 69-70, 106-08.)  He received reports from Plaintiff's co-worker, Jeff Perry, that Plaintiff essentially was not communicating with him at all.  (*Id*. at 69-70.)  Birkel noted these issues on his June 2001 evaluation of Plaintiff.  (*Id*. at 63, 66; Parikh Dep. Exh. 19)

In August 2001, Richard Rooker became part of the central management team for Cleveland Hardware.  (Rooker Dep. at 6-8.)  Rooker began investigating and evaluating the

3

Cleveland Hardware engineering department and determined that Plaintiff did not work cooperatively with his co-workers, both in and out of his department. (Rooker Dep. at 16.) Rooker based this conclusion on his conversations with multiple co-workers who complained that working and communicating with Plaintiff was difficult. (*Id*. at 18-23.)

In 2002, Rooker set out to determine whether to renew Cleveland Hardware's Pro/E maintenance agreement. (*Id*. at 142-43.) When Rooker attempted to schedule an on-site demonstration of the Pro/E program, he discovered that the engineering department did not have a working Pro/E station and that Plaintiff was unable to demonstrate the program to him. (*Id*. at 144, Exh. 26; Parikh Dep. at 138-39.) Plaintiff asserts that Cleveland Hardware was financially strapped and therefore only purchased one user license for the Pro/E software, meaning that only one person at a time could use it. (Parikh Declaration.)

The next week, Rooker asked Plaintiff to prepare a report regarding the engineering department's use of Pro/E. (Rooker Dep. 141; Parikh Dep. Exhs. V and W.) Rooker did not believe that Plaintiff's response was satisfactory. (Rooker Dep. at 141.) Plaintiff claims he was bound by a one page limitation on this report, although Rooker's memorandum to Plaintiff simply states that "I imagine this should be no more than a single page of information." (Parikh Dep. Exh. V.) Plaintiff also asserts that Rooker never asked him for additional information. (Parikh Declaration.)

Rooker asked Plaintiff to prepare another report specifically addressing how the Cleveland Hardware engineering department functioned, including a full accounting of Plaintiff's time and to have all of Plaintiff's subordinates prepare similar reports. (Rooker Dep. at 135-36; Parikh Dep. at 90-91, Exhs. L and M.) Plaintiff provided Rooker with an accounting

4

of only 90% of his time.   (Parikh Dep. at 95, Exh. M; Rooker Dep. at 135-36.)  Also, Plaintiff

failed to obtain reports from his subordinates and, instead, turned in flowcharts prepared by his

predecessors.  (Parikh Dep. at 92, Exh. M.)

In November 2002, Rooker sent Plaintiff a memorandum urging Plaintiff to be

professional in his communications with others and to reply promptly when his response was

solicited.  (Rooker Declaration.)

On January 24, 2003, Rooker and Birkel held a meeting with Plaintiff, during which he

was demoted from Engineering Manager to Staff Engineer.  (Parikh Dep. at 102, Exh. P.)  At the

meeting, Rooker and Birkel presented Plaintiff with a list of reasons for the demotion that

included Plaintiff's inability to communicate with co-workers, poor writing skills, the

engineering department's shortcomings, Plaintiff's inability to retain qualified engineers,

Plaintiff's inability to recognize his own weaknesses, the failure to properly implement Pro/E,

and his overall performance.  (Parikh Dep. at 103-05, Exh. P.)  Although Parikh was demoted,

his salary and benefits remained the same.  (Parikh Dep. at 102.)

Following Plaintiff's demotion for approximately five months, Birkel and Rooker shared

the Engineering Manager's duties.  (Parikh Dep. at 111.)   On July 1, 2003, Cleveland Hardware

hired Jeffery Schwed as the new Engineering Manager.   (Schwed Dep. at 240.)

### C.      Events Leading to Plaintiff's Termination

Schwed states that he was sensitive that it would most likely be difficult for Plaintiff to

continue working for the department that he previously managed and frequently "looked the

other way" when it came to some of Plaintiff's deficiencies and shortcomings.   (Schwed Dep. at

203-04.)   For example, Schwed claims he did not address Plaintiff's frequent personal calls,

5

often overlooked Plaintiff's argumentative demeanor, and did not discipline Plaintiff for failing to adhere to standards in creating engineering drawings. (*Id.*; Schwed Declaration.)

Schwed encouraged Plaintiff to use Microsoft Excel when creating certain documents because the software permits the user to change one figure without redrafting the entire document. (Parikh Dep. at 169; Schwed Dep. at 224.) Schwed offered to teach Plaintiff how to use Excel. (Parikh Dep. at 179; Schwed Declaration; Schwed Dep. Exh. 11.) However, Plaintiff continued to draft most of these documents by hand. (Parikh Dep. at 169; Schwed Dep. at 224.)

While under Schwed's management, Plaintiff designed an addition to his house on Cleveland Hardware's AutoCAD system. (Parikh Dep. at 158-59, Ex. AA; Schwed Dep. 153.) Computer records revealed that, despite his initial denials, Plaintiff had designed the addition during working hours. (Parikh Dep. at 159, Exh. AA.)

Schwed noticed Plaintiff's deficiencies in his engineering.  Schwed observed that Plaintiff would submit changes to a drawing he previously submitted to Cleveland Hardware's prototype maker, Dick Balog, often after Balog already had made the part.[1] (Schwed Dep. at 108.)  As a result, Schwed instructed the engineers, Plaintiff and Perry, to submit changes to Schwed instead of Balog. (*Id*. at 118.)  After receiving this instruction, Plaintiff still submitted changes directly to Balog. (*Id*. at 148-49.)

Plaintiff asserts that Cleveland Hardware's Engineering Procedure Manual did not address the actions to be taken by an engineer when a change to a part after production becomes

---

[1]Plaintiff claims that "[a]fter investigating the matter Schwed actually determined that Balog's complaint was unfounded and ordered Balog to make the change, based on the reasonable answer given to him by Plaintiff." (Plaintiff's Memorandum in Opposition at 13.)  However, Plaintiff cites page 115 of Schwed's deposition.  This page was not submitted to the Court and, thus, is outside the scope of evidence.

6

necessary.[2]  (Schwed Dep. at 117-18.)  Plaintiff also points out that Balog complained about Jeff Perry because Perry gave Balog tasks to do.  (*Id*. at 148.)  However, Perry followed Schwed's instruction not to go directly to Balog with these tasks. (*Id*.)

Schwed also concluded that Plaintiff did not grasp some basic engineering concepts.   For example, Plaintiff did not appear to understand the basic operation of a hatch spring in one of Cleveland Hardware's products for its client Bluebird.   Schwed had to disassemble the part in order to show Plaintiff how it operated.  (*Id*. at 178.)  Plaintiff's confusion about the part came to light because the tolerances he developed for the product components were incorrect and prevented the product from being assembled.  (*Id*. at 180-83; Parikh Dep. at 170-71.)  Plaintiff eventually corrected the tolerances to Schwed's satisfaction.  (Schwed Dep. at 191.)

In March 2004, during a visit to Cleveland Hardware customer Cirrus, Plaintiff did not understand an abbreviation for an engineering term mentioned by the customer's engineer. (Rooker Dep. at 39-42, 49.)  Specifically, the customer used the term "FBD," which stands for "free body diagram."   Rooker, who participated in the customer visit, was forced to step in to answer for Plaintiff.  (*Id*.)   Rooker found this to be particularly disconcerting because he had explained to Plaintiff what "FBD" meant in the prior year.  (Rooker Declaration; Rooker Dep. at 152,  Ex. 27.)

Plaintiff points out that Schwed did not know the meaning of the same abbreviation for an engineering term and that Schwed stated it was not important to know the meaning of the

---

[2]Plaintiff asserts that "Schwed also admits that he had failed to implement appropriate written procedures by that time which would have addressed the situation, and that he has never done so."  (Memorandum in Opposition at 13.)  However, the page of the Schwed Deposition upon which Plaintiff relies was not provided to the court and is not in evidence.

abbreviation, but that it was important to know how to apply the engineering principle behind the term. (Schwed Dep. at 65.)  Furthermore, Plaintiff asserts that Schwed evaluated Plaintiff's interactions with the customer as positive in a January 2004 report to Birkel.  (Schwed Dep. at 194-95, Ex. 2.)[3]

In April 2004, Schwed formally evaluated Plaintiff's performance.  (Parikh Dep. at 162-64, Exh. AC.)  Schwed stated that Plaintiff's "ability to receive instruction and cooperate with others is a problem that needs attention," and that "[t]eam environments often cause problems for [Plaintiff], because of an apparent lack of concern for ideas and suggestions put forth by fellow employees."  (Parikh Dep. Exh. AC.)  Schwed also noted that Plaintiff's inability to communicate with co-workers caused confrontations and that Plaintiff failed to listen to others. (*Id*.)    This evaluation identified other deficiencies including: lack of understanding of some basic engineering principles; refusal to learn and utilize Excel; deficient writing skills; and deficient drafting skills.  (*Id*.)

Schwed and Birkel met with Plaintiff regarding the evaluation. (Parikh Dep. at 163-64.) Birkel told Plaintiff that if he failed to show improvement in the next 30 days, he would be terminated.  (Schwed Dep. at 250.)  Finding no improvement in Plaintiff's behavior over the next month, Cleveland Hardware terminated Plaintiff on June 2, 2004. (Parikh Dep. at 48, Ex. H; Schwed Dep. Exh. 11; Rooker Dep. at 106.).  Cleveland Hardware replaced Plaintiff with Tim

---

[3]The report read:

> Cirrus Design has kept [Plaintiff] busy with frequent changes and updates.  Fast action and attention to detail has enabled us to react to every request and change generated by Cirrus.  These factors have resulted in a very satisfied customer.  In fact, they have commented on several occasions how they wish that all their vendors were this competent.

Russell, a 32 year old Caucasian male.  (Schwed Dep. at 88.)

### III.  Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.   The moving party can meet this burden in two ways: by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing the non-moving party, after adequate time for discovery, has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may rely on depositions, answers to interrogatories, and the like, to demonstrate that the non-moving party has no evidence to prove his case and hence that there can be no factual dispute.  *See id.* at 328 (White, J., concurring).  But "it is not enough to move for summary judgment . . . with a conclusory assertion that the [non-moving party] has no evidence to prove his case."  *Id.*

In assessing the merits of the motion, the court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.1997).  The court's favorable treatment of facts and inferences, however, does not relieve the non-moving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e).  *See Celotex,* 477 U.S. at 324.

An opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial.  "[T]he mere existence of some alleged

9

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Further, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986).

Accordingly, viewing the evidence in the light most favorable to the non-moving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251.

## IV.  Analysis

Plaintiff claims Defendants demoted and later discharged him because of: (1) his ancestry and ethnic characteristics in violation of 42 U.S.C. § 1981; and (2) his age in violation of O.R.C. § 4112.02(A).

### A.    *McDonnell Douglas* Framework

#### 1.    42 U.S.C. § 1981

Title 42 U.S.C. § 1981 prohibits employment discrimination based on race, ancestry, or ethnic characteristics.  *See Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613, (1987); *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1095 (6th Cir. 1996).  Such discrimination may be proved by either direct or circumstantial evidence.  *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).  In a circumstantial evidence case of discrimination under § 1981, the Sixth Circuit has adopted the *McDonnell Douglas* rule that a plaintiff may establish a *prima*

10

*facie* case of discrimination by showing: (1) he is a member of a protected class; (2) he was qualified for his job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his class.  *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, at 572-73 (6th Cir. 2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

If the plaintiff satisfies the *prima facie* test, the burden shifts in the second step to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection. *Johnson*, 215 F.3d at 573.  Should the defendant carry this burden, the plaintiff's evidence must be sufficient to create a genuine issue of material fact that the proffered reason was merely a pretext to hide unlawful discriminatory motives by showing that (1) the stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain the defendant's actions.[4]  *Id.*

---

[4] In *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), the Supreme Court reassessed Title VII burdens in light of Section 107 of the Civil Rights Act of 1991, making available to plaintiffs in circumstantial evidence discrimination cases the possibility of a jury instruction on so-called "mixed motives."  Under the "mixed motive" standard, plaintiffs may succeed in defeating the defendant's articulation of a legitimate non-discriminatory motive by demonstrating that the alleged illegitimate motive was, according to the statute, "a motivating factor for any employment practice, even though other factors also motivated the practice."  That is to say, the plaintiff need not prove that the defendant's stated reason is pretextual if he can demonstrate that at least one illegitimate motive also lay among the defendant's motivations.  However, the Sixth Circuit recently held that *Desert Palace* does not modify the *McDonnell Douglas* test in employment discrimination cases filed under § 1981.  *Aquino v. Honda of Am., Inc.*, 2005 U.S. App. LEXIS 24981, 22-24 (6th Cir. November 18, 2005) (unpublished).

### 2.    O.R.C. § 4112.02[5]

Under O.R.C. § 4112.02(A), it is an unlawful discriminatory practice for any employer, because of the age of any person, to discharge without just cause or otherwise to discriminate against that person with respect to tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.[6]

Ohio has adopted the *McDonnell-Douglas* burden-shifting analysis to analyze age discrimination claims.  *See Barker v. Scovill, Inc.*, 6 Ohio St.3d 146, 147-48 (1983).  A claim for age discrimination may be proven by either direct or circumstantial evidence. *See Byrnes v. LCI Communication Holdings Co.,* 77 Ohio St.3d 125, 128 (1996).  Absent direct evidence of age discrimination, the employee may establish a *prima facie* case of age discrimination through indirect evidence by demonstrating that he (1) is a member of a protected class under § 4112.02 or § 4112.14, (2) was subject to an adverse employment decision, (3) is qualified for the position, and (4) was replaced by, or the discharge permitted the retention of, a person of substantially younger age.  *See Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St. 3d 175, 180 (2004); *Vickers v. Wren Indus.*, 2005 Ohio 3656, P29 (Ohio Ct. App. 2005).

If the employee establishes a *prima facie* case, the burden of proof shifts to the employer to articulate a legitimate non-discriminatory reason for the employee's discharge.  *Kohmescher v.*

---

[5]In a footnote, Defendants assert that Plaintiff failed to file his Chapter 4112 age discrimination claim within the period set forth in the statute of limitations.  The Court need not address this argument as Defendants' motion for summary judgment is granted on other grounds.

[6] Although O.R.C. § 4112.02(A) also prohibits discrimination based on ancestry, Plaintiff only alleges discrimination based on age under this statute.  *See* Amended Complaint, Count II.

*Kroger Co.*, 61 Ohio St.3d 501 (1991).  If the employer articulates a non-discriminatory reason, the employee has the burden to prove that the employer's articulated reason for the discharge is a pretext for discrimination.  *Id.*

### B.    *Prima Facie* **Case of Discrimination**

In the instant action, Plaintiff has not set forth any direct evidence of discrimination based on Plaintiff's ancestry, ethnicity, or age.  Accordingly, the Court will analyze the facts and evidence under the *McDonnell Douglas* framework.  For purposes of the summary judgment motion only, Cleveland Hardware assumes that Plaintiff can establish a *prima facie* case of discrimination.  Therefore, Cleveland Hardware must set forth a legitimate, non-discriminatory reason for Plaintiff's demotion and subsequent termination.

### C.    **Legitimate Non-Discriminatory Reasons and Pretext**

Defendants set forth several legitimate, non-discriminatory reasons for Plaintiff's demotion and termination, *see infra*.   Thus, the burden shifts to Plaintiff to demonstrate that Defendants' legitimate reasons are actually pretext for discrimination.  A plaintiff establishes pretext by showing the defendant's legitimate non-discriminatory reason: (1) had no basis in fact; (2) did not actually motivate the defendant's actions; or 3) was insufficient to warrant the defendant's actions. *Manzer v.Diamond Shamrock Chems. Co*, 29 F.3d 1078, 1084 (6th Cir. 1994). The first method of establishing pretext requires the plaintiff to show the facts necessary for the defendant's legitimate non-discriminatory reason never occurred or were false. *Id.*  The second method of proving pretext requires the plaintiff to establish that the weight of the circumstantial evidence makes it more likely than not that the defendant's legitimate non-discriminatory reason is a pretext.  *Id.* ("In such cases, the plaintiff attempts to indict the

credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant.").  The third method of establishing pretext requires the plaintiff to show that other employees, such as employees not in the protected class, did not suffer adverse employment action for the same conduct in which the plaintiff engaged. *Id.*   If the plaintiff shows the defendant's legitimate non-discriminatory reason is a pretext for discrimination, the jury may infer discrimination.  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).  The plaintiff retains the ultimate burden of proof at all times. *Id.*

If the plaintiff is attempting to show that a defendant's legitimate, non-discriminatory reason has no basis in fact, as appears to be the case in the instant action,  the plaintiff must submit evidence demonstrating that the employer did not " 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citing *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir.1998)).  To inquire into the defendant's "honest belief," the court looks to whether the employer can establish "reasonable reliance" on the particularized facts that were before the employer when the decision was made.  *Smith*, 155 F.3d at 807 ("[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.").  If there is no reasonable dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.  *See Braithwaite*, 258 F.3d at 494.

Moreover, in an instance such as this where a defendant sets forth multiple legitimate non-discriminatory reasons for adverse action, a plaintiff must proffer evidence that shows each

14

of the employer's justifications are pretextual. *See Wilson v. AM General Corp.*, 167 F.3d 1114, 1120 (7th Cir.1999) ("Generally the employee has the burden of demonstrating that each proffered non-discriminatory reason is pretextual."); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1539, 1543 (11th Cir.1997)).

Nevertheless, the jury could reasonably find the employer lacks credibility when the plaintiff casts substantial doubt on many of the employer's multiple reasons,. *See Chapman v AI Transport*, 229 F.3d 1012, 1049-51 (11th Cir. 2000) (Birch, J., concurring in part and dissenting in part).  "This is but common sense: if a person is shown to be a liar in an outrageous manner or is shown to have lied about a number of issues, the inference that the person is non-credible, and should not be believed as to other issues, is a reasonable one." *Id.* at 1050.  Stated differently, " '[t]here may be cases in which the multiple grounds offered by the defendant . . . are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff may [prevail].' " *Wilson*, 167 F.3d at 1120 (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 70 (7th Cir. 1995)); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1998) ("[a]n employer's strategy of simply tossing out a number of reasons . . . in the hope that one of them will 'stick' could easily backfire. . . . [A] multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable that any application of the 'honest belief' rule is inappropriate." (quotation marks and citations omitted)).

For the reasons that follow, this Court concludes that Plaintiff has failed to demonstrate that Defendants' multiple legitimate discriminatory reasons had no basis in fact,  were insufficient to warrant Plaintiff's demotion and termination, or did not actually motivate Defendants.  Thus, Plaintiff has not raised a genuine issue of material fact on the question of

15

pretext.

### 1.    Plaintiff's Demotion

Defendants assert that there were several legitimate non-discriminatory reasons for Plaintiff's demotion and that each of these reasons were identified in a letter given to Plaintiff at the time of his demotion.   This letter set forth the following reasons: (a) complaints from others regarding Plaintiff's interpersonal communication skills; (b) deficient writing skills; (c) high turnover in the engineering department; (d) refusal to take responsibility for the engineering department's shortcomings; (e) failure to implement the Pro/E software; and (f) failure to manage product development and improvement programs

Plaintiff attempts to demonstrate these reasons were pretextual by asserting that Defendants reasons are fraught with "internal inconsistencies."  Although Plaintiff nitpicks at event details and raises peripheral issues, as explained in detail below, Plaintiff simply does not raise a genuine issue of material fact that any of Defendants' legitimate, non-discriminatory reasons for the demotion are false.

Moreover, it is Plaintiff's burden to demonstrate that the legitimate, non-discriminatory reasons are pretextual.  Plaintiff has not demonstrated that an illegitimate reason motivated his demotion or that the legitimate, non-discriminatory reasons set forth by Defendants are false or insufficient to justify demotion, and fails to address two of the reasons with any type of analysis or evidence; that is, he does not dispute that he refused to take responsibility for the department's shortcomings and failed to manage product development and improvement programs.  These reasons alone are sufficient to motivate demotion.   A reasonable jury could not find that Defendants possessed an illegal, discriminatory motive in demoting Plaintiff.

16

### a.       Complaints Regarding Interpersonal Communication Skills

Plaintiff attempts to show pretext for Defendants' claim that co-workers complained about Plaintiff's interpersonal skills by pointing to Rooker's testimony that he found Plaintiff to be a "team player" when working with him.  Plaintiff claims that this creates an "internal inconsistency" that renders Defendants' explanation "highly suspect."  The Court disagrees.

Rooker's statement that employees complained about Plaintiff's communication skills is not discredited by the statement that Rooker found Plaintiff to be a "team player" when he worked with him directly.  This statement does not disprove that others complained about Plaintiff or that their complaints were invalid.   In fact, Rooker also states that he received complaints alleging Plaintiff was not a team player from several employees - and identifies four such employees.  (Rooker Dep. at 161.)   In addition, Birkel received similar complaints from employees. (Birkel Dep. at 12, 107-08.)

Co-worker complaints regarding interpersonal skills constitute a legitimate, non-discriminatory reason for discipline and are not considered pretextual where a plaintiff does not show (1) that the complaints were never made, (2) that supervisors were not concerned about the complaints, or (3) that the complaints were not a basis for disciplinary action.  *See Fitten v. Chattanooga-Hamilton County Hosp. Authority*, 75 Fed. Appx. 384, 2003 WL 22087830 (6th Cir. Sept. 5, 2003); *see also Marshall v. Summa Health Systems Hospitals*, 66 Fed Appx. 598, 2003 WL 21277336 (6th Cir. Jun. 2, 2003) ("[W]hile [Plaintiff] insists that the complaints against her were unjustified, she concedes that [Defendant] received the complaints, investigated them, and relied upon them in terminating her and her fellow supervisors.  In short, the record contains no evidence tending to show that [Defendant's] non-discriminatory explanation has no basis in fact,

17

did not actually motivate the decision, or was insufficient to warrant her termination.")  In the instant action, Plaintiff has set forth no evidence showing that the complaints regarding Plaintiff's communication skills were not made, that Defendants did not have concern about these complaints, or that the Defendants did not rely on such complaints in making the decision to demote Plaintiff.  As such, Plaintiff has not shown that this legitimate, non-discriminatory reason is pretextual.

### b.  Deficient Writing Skills

Defendants assert that Plaintiff's writing skills (both grammar and spelling) were deficient at the time of his demotion.  Plaintiff maintains that assertion is unfounded and, thus, pretext for discrimination.

Plaintiff claims in his declaration that Birkel never mentioned to him that there was a problem with his writing prior to the January 2003 evaluation.  (Parikh Declaration.)  Plaintiff also notes that in his 2000 and 2001 evaluations, Birkel rated Plaintiff's written communication skills as a 2 on a scale of 1 to 4 or "meets expectations."  (Birkel Dep. at 23, 67, Exhs. 15 and 19.)  However, previous positive evaluations "do not render [Plaintiff's] more recent negative evaluations inherently untrustworthy."  *Rose-Maston v. NME Hospitals, Inc*., 133 F.3d 1104, 1109 (8th Cir. 1998) (holding that Plaintiff's assertion that prior satisfactory evaluations do not support an inference of pretext where the underlying explanations for the discipline are not disputed).

Plaintiff also contends that Rooker admitted he did not read at least some of the writings that were the basis of criticism in the January 2003 demotion.  However, Plaintiff fails to set forth any evidence that Birkel, who also took part in the evaluation that led to Plaintiff's

18

demotion, did not read those writings.   In addition, Rooker stated that this criticism was based in part on "reports, communiques, and emails that [Plaintiff] had done personally with myself to myself [sic]." (Rooker Dep. at 88.)  Most importantly, Plaintiff fails to assert that he did, in fact, employ proper spelling and grammar in these writings.  As such, Plaintiff has not shown that this reason is pretextual.

### c.        High Turnover

In opposition to  Defendants' assertion that a high turnover rate existed under Plaintiff's management, Plaintiff argues that the engineers who resigned left for reasons other than personal issues with Plaintiff.   Plaintiff asserts that "two of the five engineers left for better opportunities, another left because he failed Cleveland Hardware's medical examination, another moved to New York to be with his significant other, and the fifth was fired by Jim Hoban." (Memorandum in Opposition at 7.)

Besides the fact that Plaintiff's assertion appears to be based on inadmissible hearsay[7] set forth in his declaration, Plaintiff does not dispute that a high turnover rate existed under his watch as head of the engineering department.   It is not unreasonable for Defendants to believe that this rapid fire turnover in a department of four people is a reflection on Plaintiff's management skills.   Moreover, Defendants' assumptions that the turnover was due in part to Plaintiff's creation of bad working environment is supported by one engineer's statement to Birkel that he was resigning due to his inability to work with Plaintiff.[8]   Plaintiff fails to

---

[7]To establish the truth of the matter asserted, Plaintiff could have submitted the affidavits of those former employees or taken and submitted their depositions.

[8]Plaintiff argues that this statement is inadmissable hearsay.  However, unlike the

19

demonstrate that Defendants did not hold an honest belief that Plaintiff played a role in his department's turnover.  As such, Plaintiff does not show pretext behind Defendants' reason.

### d.      Refusal to Take Responsibility

Defendants cite Plaintiff's refusal to take responsibility for the shortcomings of the engineering department as another reason for his demotion.  In his Memorandum of Opposition, Plaintiff presents no evidence disputing this reason.  Therefore, Plaintiff cannot meet his burden of demonstrating pretext on this issue.

### e.      Failed Implementation of the Pro/E Software

Defendants assert that yet another reason for Plaintiff's demotion was the failure of the Pro/E software program.  Plaintiff claims that this assertion is pretextual for several reasons.

First, Plaintiff maintains that "Defendants' version of events regarding the Pro/E project is based on large part on the testimony of Richard Rooker" who did not start working at Cleveland Hardware until August 2001.  This fact alone has no bearing on the Court's decision.  The testimony of Richard Rooker was used by Defendants to establish his understanding of the Pro/E project and his reasons for demoting Plaintiff.  In addition, Defendants' relied upon Plaintiff's testimony, the declaration of James Socha, and numerous exhibits to establish the facts regarding the Pro/E installation in the years prior to Rooker's tenure at Cleveland Hardware.

_____

statements offered by Plaintiff regarding the first five engineers to leave, which were set forth to show the truth of the matter asserted, Defendants set forth the statement of Bill Kaminski to show effect on the listener.  *See US v. Branham*, 97 F.3d 835, 857 (6th Cir. 1996) (finding statement offered to show its effect on the listener is not hearsay).  In other words,  this testimony merely demonstrates that Defendants received such information and relied upon it.  This evidence addresses whether Defendants held an honest belief that Plaintiff's behavior was a cause for the high turnover rate.

Second, Plaintiff maintains that he was not the person who wanted to purchase the Pro/E software.  Plaintiff also asserts that he was not in charge of purchasing and installing the hardware required for the Pro/E software.   However, neither of these assertions are sufficient to create a genuine issue of material fact regarding whether implementation of the Pro/E program was a failure under his watch as head of the engineering department, as alleged by the Defendants.  Plaintiff presents only collateral issues with minimal impact on the matter at hand.

Third, Plaintiff argues that he was unable to fully implement the Pro/E program because of Cleveland Hardware's financial problems.  Specifically, Plaintiff claims that Cleveland Hardware only purchased one user license, meaning that the software could be used by only one person according to a schedule.  However, this fact does not explain why there were no working Pro/E stations at the time that Rooker originally wanted a demonstration of the program.  Nor does it explain why Plaintiff was unwilling and, apparently, unable to demonstrate how the Pro/E Program worked.

Fourth, Plaintiff claims that Birkel never mentioned any problems with the Pro/E program until January 24, 2003 and mentioned nothing about the Pro/E program in his 2000 and 2001 evaluations of Plaintiff.  Plaintiff also asserts that "Rooker now admits that the issues with Pro/E had existed for four years and that ultimately it was Tom Birkel, as leader of the Cleveland Hardware division, who was responsible for the alleged Pro/E failure."  Plaintiff has taken some liberty with his characterization of Rooker's testimony.   Rooker's testimony is as follows:

> Q.    Who did you hold responsible for allowing [the Pro/E implementation] problem to exist for four years?
>
> A.    Bhupendra.
>
> Q.    Why Bhupendra?

21

A.    He's the engineering manager.

Q.    In a team oriented work environment, are members of the team held
      responsible for a failure?
      * * * *

A.    They contribute to it, but ultimately it's the leader that has to take ultimate
      responsibility.

Q.    Who was the leader at Cleveland Hardware as of January 24, 2003?

A.    In the engineering department, it was Bhupendra.

Q.    Who was the leader at Cleveland Hardware as of January 24, 2003?

A.    Tom Birkel was general manager.

(Rooker Dep. at 100.)  Rooker's acknowledgment that Tom Birkel, as general manager, had

ultimate responsibility for the program based upon his role as group leader does not indicate

either that Parikh lacked responsibility for implementing the program or that Defendants'

concerns about Plaintiff's failures with the program are pretextual

      Fifth, Plaintiff argues the Defendants claim "that Plaintiff's response to Rooker's request

for information about the Pro/E program was not satisfactory is suspect." (Memorandum in

Opposition at 10.)    Plaintiff asserts that he was restricted by a one page limit in response, that

his response answered all the questions asked by Rooker, that Rooker accepted the report

without asking for additional information, and that Rooker apparently agreed with Plaintiff's

assessment of Pro/E because Rooker never made any changes with regard to the Pro/E software.

While Rooker's memorandum requesting this information from Plaintiff suggests that it should

take no more than a single page of information to complete the assignment, Rooker did not

appear to be placing any page limitations on Plaintiff.  (Parikh Dep. Exh. V.)  Moreover,

Plaintiff's memorandum in response is only about half a page long.  (Parikh Dep. Exh. W.)   It is

apparent from this Court's review that Plaintiff failed to address several issues identified by

Rooker, including whether the original need for Pro/E still existed and how Plaintiff would

implement a specific plan to ensure that the engineering department achieved the requisite level

of expertise.  (*Id*.)   Even if the fact that Rooker did not request additional information and did

not make changes to the Pro/E program is sufficient to create an issue of fact regarding whether

Plaintiff satisfactorily completed this particular assignment, it is not sufficient to create a genuine

issue of material fact to show that the failed implementation of the Pro/E program was pretext in

light of all the other examples set forth by Defendants.  *See Wilson*, 167 F.3d at 1120.

Lastly, Plaintiff argues that the Defendants' claim that Plaintiff's involvement in the

Pro/E project caused Cleveland Hardware embarrassment is suspect because (1)  neither Socha

or Birkel mentioned this embarrassment to Plaintiff at the time and, (2)  Socha's declaration,

which Defendants use to support their assertion that Plaintiff caused the company

embarrassment,  was written six years after the fact.  Plaintiff's argument fails for several

reasons.  First, the fact that the declaration was written six years after the underlying events has

very little bearing on this Court's decision.  All the testimony presented on this issue, including

that in Plaintiff's own declaration, was set forth years after the fact.  Such is often the nature of

litigation.  Second, Defendants' position is supported by a letter to Socha from Michael Vedda,

Regional Director of the Pro/E vendor, discussing the "misunderstanding" between his company

and Cleveland Hardware, threatening to discontinue support for the Pro/E program, and citing

some of Plaintiff's actions as a cause of the misunderstanding.  (Socha Declaration, Exh. A.)

Ultimately, Plaintiff does not present any evidence that demonstrates that implementation

of the Pro/E program was successful or that Plaintiff knew how to use the program.  The

evidence shows Defendants had a basis in fact for believing that Plaintiff failed to implement the program and lacked the knowledge to use it.  Thus, Plaintiff has not shown that Defendants' citation to the failed implementation of the Pro/E program is pretext for discrimination.

### f.  Failure to Manage Product Development and Improvement Programs

Defendants assert that another reason for the demotion is that Plaintiff failed to create and manage product development and improvement programs.  Plaintiff does not appear to address this issue in any way or allege that the proffered reason is pretextual.

As Plaintiff cannot demonstrate that this reason or any of Defendants' legitimate reasons for Plaintiff's demotion, either separately or viewed as a whole, were pretext for discrimination, summary judgment is granted in favor of Defendants on the issue of demotion.

### 2.  Plaintiff's Termination

Defendants assert that Plaintiff was terminated for the reasons set forth in the April 2004 evaluation, namely: (a) lack of understanding of basic engineering principles; (b) refusal to learn and utilize Excel; (c) poor interpersonal communication skills; (d) deficient writing skills; and (e) deficient drafting skills.  Defendants further assert that Plaintiff did not attempt to improve upon any of these deficiencies, even after being warned that he would be terminated if he failed to show improvement.

Once again, Plaintiff attempts to point to "internal inconsistencies," but, as explained more thoroughly below, Plaintiff ultimately fails to demonstrate that Defendants' legitimate, non-discriminatory reasons were actually false and not asserted with honest belief.  Plaintiff does not attempt to show that these reasons were insufficient to justify termination by pointing to similarly situated employees who were treated differently or by presenting evidence that other

24

reasons motivated the discharge.   Moreover, Plaintiff fails to address some of reasons Defendants set forth – namely, Plaintiff's refusal to learn and utilize Excel and his failure to make efforts to improve deficiencies identified by Defendants.   These reasons alone are sufficient to justify termination in this instance.   Thus, Plaintiff cannot meet his burden to show that Defendants' legitimate, non-discriminatory reasons are pretextual.

### a.    Demonstrated Lack of Understanding of Basic Engineering Principles

Defendants cite two examples of Plaintiff's lack of understanding of basic engineering principles: the Cirrus customer visit and the hatch spring for Bluebird.

### (1.)    The Cirrus Visit

Plaintiff contends that although he did not know what the term "FBD" meant at a customer visit to Cirrus, he knows the meaning of "free body diagram."  However, the critical issue is not whether Plaintiff actually knew the term "free body diagram," but whether Rooker honestly believed Plaintiff lacked understanding of the term.  *See Braithwaite*, 258 F.3d at 494. Plaintiff has failed to set forth any evidence that Rooker did not honestly believe that Plaintiff failed to understand what the term "FBD" or "free body diagram" meant.  Thus, Plaintiff cannot demonstrate pretext.

Plaintiff also asserts that Schwed did not know the meaning of the term "FBD." However, Plaintiff makes absolutely no attempt to provide this Court with any analysis that Schwed was a similarly situated employee.

Plaintiff points to a January 2004 monthly report Schwed wrote to Birkel:

Cirrus Design has kept [Plaintiff] busy with frequent changes and updates.  Fast action and attention to detail has enabled us to react to every request and change generated by Cirrus.  These factors have resulted in a very satisfied customer.  In

> fact, they have commented on several occasions how they wish that all their
> vendors were this competent.

However, this report was written before the March 2004 Cirrus visit when Plaintiff's

understanding of  the meaning of "FBD" became an issue.  Moreover, this report does not touch

upon the issue of whether Defendants held an honest belief that Plaintiff lacked understanding of

the term "free body diagram."

Finally, Plaintiff states that "Defendants want us to believe that Plaintiff, who held an

advanced degree in mechanical engineering with several patents to his name and who had

worked at Cleveland Hardware without issue from 1996-2004, suddenly became incompetent

because he did not know one supposedly 'basic engineering term,' a term that Schwed himself

did not know.  This explanation is preposterous."  (Memorandum in Opposition at 15-16

(footnote omitted).)   Defendants did not state that Plaintiff suddenly became incompetent,

instead they suggested that Plaintiff "demonstrat[ed] a lack in some basic-engineering

principles," citing both the Cirrus visit and the Bluebird spring incident, and that Plaintiff might

benefit from a brief refresher course.  (Parikh Dep., Exh. AC.)   Plaintiff simply fails to rebut the

fact that he did not know what "FBD" meant or that it was not a basic engineering term.

### (2.)    Bluebird

Defendants assert that Plaintiff did not know how a spring hatch, used by Cleveland

Hardware client Bluebird, operated and that Plaintiff developed incorrect tolerances for a

Bluebird product.  Plaintiff argues that (1) Schwed admits Plaintiff contributed to solving the

Bluebird spring issue and (2) Schwed did not "h[o]ld the event against Plaintiff in any way."

(Memorandum in Opposition at 16, citing Schwed Dep. at 190-91.)    Plaintiff questions how the

Bluebird latch spring incident could have been a factor in Plaintiff's termination under these

26

circumstances.

Plaintiff does not contest the validity of Defendants' assertion that Plaintiff lacked knowledge regarding the spring hatch operation or that he developed incorrect tolerances. Moreover, Schwed's statement that he personally did not hold the event against Plaintiff is ambiguous.  Plaintiff does not attempt to interpret this statement.  Assuming Schwed meant that Schwed would not take adverse action against Plaintiff in his career, it has little impact on the issue of pretext and does not create a genuine issue of material fact given the totality of the evidence.  First, this is one event of several on which Defendants based their decision to terminate Plaintiff.  Second, the decision to terminate Plaintiff was a group decision between Schwed, Rooker, and Birkel.  (Birkel Dep. at 77.)  The fact that one person out of three might not find reason for professional reprimand in this instance, does not demonstrate that the group as a whole found it insignificant.   Therefore, Plaintiff has not shown pretext surrounding Defendants' assertions that Plaintiff's lack of knowledge in some basic engineering principles was one of the reasons behind his termination.

### b.        Refusal to Learn and Utilize Excel

Defendants maintain that another reason for Plaintiff's termination was his failure to learn and utilize Excel as directed by his superiors.  Plaintiff does not present any argument that this reason is pretext for discrimination.

### c.        Poor Interpersonal Communication Skills

Plaintiff asserts that Rooker admits that not being a "team player" is an insufficient reason for termination and that Rooker stated that not being a "team player" was the only reason for Plaintiff's termination.  Plaintiff again takes some liberties with the deposition testimony.

27

Rooker stated at the time of the deposition that he did not recall the other reasons for Plaintiff's termination.  Moreover, the testimony of Birkel and Schwed, as well as the documents pertaining to Plaintiff's termination, set forth multiple reasons for the termination.

Plaintiff also finds "suspicious" Schwed's account of one interaction with Balog. According to Plaintiff, although Schwed's testimony on the subject was not submitted to the Court,[9] Schwed admitted that one of Balog's complaints about Plaintiff was unfounded.  Even assuming this is true, Plaintiff is citing only one incident out of several.  Schwed testified that Balog complained multiple times about Plaintiff submitting changes to him after he had already developed a prototype.  (Schwed Dep. at 143-44.)

Plaintiff also complains that the Engineering Procedure Manual did not address the procedure for an engineer to change a part after production when it becomes necessary and that Schwed failed to implement written procedures addressing the situation.  Once again, Plaintiff cites pages of the Schwed deposition not submitted to the Court.  But even assuming evidence exists in the record supporting this assertion, it does not address the fact that Plaintiff ignored Schwed's verbal directive that changes should not be submitted directly to Balog, but rather given to Schwed himself.  (Schwed Dep. at 148.)

Plaintiff asserts that Balog also complained to Schwed about Perry giving him tasks, a matter that does not involve changes to parts after production.  This is insufficient to establish disparate treatment.  Schwed directed both Perry and Plaintiff that any new changes or new projects for Balog should be not be submitted directly to Balog, but rather submitted to Schwed.

_____

[9]Plaintiff cites page 115 of Schwed's deposition.  This particular page was not submitted to the Court.

28

Moreover, whereas Plaintiff only occasionally followed the directive, Perry followed the directive on all occasions.  (*Id.*)

Finally, Plaintiff does not address Defendants' multiple other examples of Plaintiff's failure to act as a team player and his exhibition of poor interpersonal skills, including lack of enthusiasm when taking on tasks, using an argumentative tone, and not listening to other's suggestions.  (Schwed Depo. at 225-26.)  Schwed witnessed Plaintiff not being open minded with at least three of his co-workers.  (Schwed Dep. at 227.)   Furthermore, both Rooker and Birkel received complaints from co-workers regarding Plaintiff's interpersonal communication skills.  (Rooker Dep. at 19-21; Birkel Dep. at 12, 107-08.)

Plaintiff simply has not set forth sufficient facts demonstrating that Defendants' citation of Plaintiff's lack of interpersonal communication skills as one of the reasons for termination is pretextual.

### d.       Deficient Writing Skills

Plaintiff claims that Defendants' assertion that Plaintiff's writing skills are deficient is suspect because "Schwed admits that [monthly] reports submitted to him by Plaintiff were entirely satisfactory."  (Memorandum in Opposition at 12, citing Schwed Dep. at 158-59.)  It is not clear whether Schwed was referring to the content or the writing.  (Schwed Dep. at 159.)  But assuming that Schwed was referring to Plaintiff's writing ability, Plaintiff still has not shown pretext.  Schwed referred to other documents in which Plaintiff exhibited deficient writing skills - namely, other reports, e-mails, and customer correspondence.  (Parikh Dep. Exh. AC.)  In addition, as stated previously, the decision to terminate Plaintiff was a group decision between Schwed, Rooker, and Birkel.  Plaintiff provides no evidence that Rooker and Birkel believed that

29

Plaintiff's writing was satisfactory.

Plaintiff also argues that "Rooker admits to making the same kind of writing errors that resulted in his concerns over Plaintiff's writing." (Memorandum in Oppostion at 12, citing Rooker Dep. at 94-95.) Plaintiff reaches this conclusion through Rooker's testimony that on a single occasion he used the term "sighted" instead of "cited." This single instance does not demonstrate that Rooker regularly made spelling and grammatical errors, nor does it demonstrate that Plaintiff did not make such errors.

Finally, Plaintiff asserts that Cleveland Hardware had clerical support personnel who could have assisted Plaintiff in editing his written communications. The Court fails to see how this demonstrates pretext. Simply because clerical support could have assisted Plaintiff does not mean that it was not within Plaintiff's job responsibilities to draft grammatically correct documents, or take some steps to improve or make certain that his written documents were grammatically correct. Thus, Plaintiff cannot demonstrate that Defendants' assertion that Plaintiff's writing skills were deficient is other untrue or an insufficient basis for termination.

### e.        Deficient Drafting Skills

Defendants assert that although Plaintiff demonstrated an adequate ability to operate the AutoCAD drafting packages, more AutoCAD classes would help Plaintiff be a more productive operator. (Parikh Dep. Exh. AC.) Plaintiff does not challenge this assertion in anyway.

### f.        Failure to Improve

Defendants assert that Plaintiff disregarded Defendants' directive to show improvement in the deficiencies identified in the April 2004 evaluation, which specifically identified steps that Plaintiff could take to improve, including taking a brief refresher course in engineering,

AutoCAD classes, and Excel training.  (*Id*.)  Plaintiff admits that he did not do any of these things.  (Parikh Dep. at 171, 168, 169.)  Plaintiff further does not argue that this reason for termination is pretextual.

As Plaintiff has failed to demonstrate that this legitimate, non-discriminatory reason or that any of the reasons set forth in Section IV.C.2 of this Order are pretextual,  Plaintiff has not meet his burden.   Thus, summary judgment is granted in Defendant's favor on the issue of Plaintiff's termination.

### CONCLUSION

Examining the totality of the evidence, it is clear that a reasonable jury could not find that Plaintiff's demotion and termination were the result of illegal discrimination.    Instead of raising genuine issues of material fact that Defendants' legitimate, non-discriminatory reasons are false, Plaintiff merely sets forth factual arguments that are collateral and immaterial to the issue of pretext.   Furthermore, Plaintiff does not argue that these reasons were insufficient or did not actually motivate Defendants.  Finally, Plaintiff fails to address several of the reasons set forth by Defendants, which alone were sufficient to justify Plaintiff's demotion and termination.  Viewing the record as a whole and in a light most favorable to the Plaintiff, this Court finds that Plaintiff has not met his burden of showing pretext.

For the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED and judgment is granted in favor of Defendants on all counts.

IT IS SO ORDERED.

31

/s/ Nancy A. Vecchiarelli
U.S. Magistrate Judge


Date: May 26, 2006